UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GLOBAL MERCHANT CASH INC., D/B/A/ WALL
STREET FUNDING,

                    *Plaintiff and Counter-defendant,*

        -against-

ROME-AIRE SERVICES, INC., DON GREEN ELECTRIC
LLC, EMERALD MANAGEMENT GROUP LLC,
EMERALD LAW, PLLC, AND KIEL JOSEPH GREEN,

                    *Defendants and Counterclaimants.*
                    .

24-CV-799 (ARR) (PK)

**OPINION & ORDER**

ROSS, United States District Judge:

In the present action, plaintiff Global Merchant Cash Inc. ("GMC") brings suit against

defendants Rome-Aire Services, Inc.; Don Green Electric LLC; Emerald Management Group

LLC; Emerald Law, PLLC; and Kiel Joseph Green. Initial Pleadings at 2, ECF No. 2-1

("Complaint"). GMC's claims are premised on defendants' alleged breach of a contract (the

"Agreement") between the parties, *see* Merchant Agreement, ECF No. 27-2 ("Agreement"), in

which GMC purported to purchase a portion of defendants' receivables in exchange for

immediate delivery of a specified purchase price, Complaint ¶ 6. Defendants asserted three

counterclaims against GMC for (1) declaratory judgment, (2) breach of contract, and (3) civil

RICO. Amended Answer ¶¶ 105–85, ECF No. 22 ("Answer").

Before me now is GMC's fully briefed motion to dismiss defendants' counterclaims.[1] For

the reasons set forth below, I grant GMC's motion to dismiss.

**I.    Parties**

---

[1] *See* Pl.'s Mem. in Supp. of Mot. to Dismiss, ECF No. 27-5 ("MTD"); Mem. in Opp. of Mot. to
Dismiss, ECF No. 28 ("Def.'s Opp."); Reply in Supp. of Pl.'s Mot. ("Pl.'s Reply"), ECF No. 29.

Plaintiff GMC is a company engaged in the "merchant cash advance" ("MCA") industry. Answer ¶ 50. "MCA agreements are financial products, often marketed to small businesses through high-pressure sales operations . . . , that purport to purchase at a discount a portion of a business's future receivables." *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 241 (S.D.N.Y. 2022). GMC is owned and operated by Jay Keller, who is "responsible for the day-to-day operations" of GMC and has "final say on all [of its] business decisions." Answer ¶¶ 158, 167. Defendants also allege that GMC's financial products were supported by investors that provided GMC with "all or a portion of the pooled funds necessary to fund" GMC's agreements. *Id.* ¶ 174.

Defendants consist of four companies, Rome-Aire Services, Inc.; Don Green Electric LLC; Emerald Management Group LLC; and Emerald Law, PLLC (the "Corporate Defendants"); and one individual, Kiel Joseph Green. Defendants allege that they were in the heating, ventilation, and air conditioning ("HVAC") business and were "primarily involved in the sale, installation, and service of residential HVAC systems and equipment." Answer ¶ 58.[2] Both the Complaint and Answer fail to describe the nature of the relationship between the Corporate Defendants or their relationship with Mr. Green.

## II.    The Agreement

On September 13, 2023, defendants executed a contract, titled the "Receivables Purchases Agreement" (the "Agreement"), with GMC. Answer ¶ 57; *see also* Agreement. Under the Agreement, GMC would pay defendants a "purchase price" of $250,000.00, of which

---

[2] However, I note that at least one of those entities—Emerald Law, PLLC—is self-evidently a law firm.

$242,465.00 would be disbursed to defendants and $7,500.00 would be retained by GMC for its "due diligence and other costs in performing . . . th[e] financing transaction." Agreement at 3.[3]

In exchange for immediate delivery of the purchase price, GMC purchased $330,000.00 of the Corporate Defendants' "receivables," Answer ¶¶ 96–97, which the Agreement broadly defined as all "payments, receipts, settlements and funds paid to or received by or for" the Corporate Defendants, Agreement at 2. Defendants would pay that $330,000.00 sum, referred to as the "Purchased Receipts Amount," by delivering 10% of their receivables each week to GMC until the entire sum was paid. *Id.* at 3.

However, the Agreement did not impose a payment obligation that fluctuated based on defendants' actual receivables, nor did it provide for a process by which the parties would conduct a regular review of defendants' receivables and adjust the weekly payment obligation. Instead, the Agreement required defendants to pay fifty-two weekly installments of $6,346.15, which the Agreement purported was a "good faith approximation" of 10% of defendants' "expected future [receivables]." Agreement at 3, 5; *see also* Answer ¶ 96. That payment obligation could be adjusted to "more closely approximate . . . [10%] of [defendants'] future [r]eceipts" upon a written reconciliation "request" by either party. Agreement at 5. Reconciliation of the weekly repayment obligation would not alter the total sum to be repaid, as the Agreement provided that "[a]ny reconciliation may substantially extend the duration of this Agreement" and required payments to continue "until the entire Purchased Receipts Amount [of $330,000.00] is delivered" to GMC. *Id.* at 3, 5.

Defendants allege that, despite the Agreement's disclaimers, the initial repayment obligation bore no actual relationship to 10% of their receivables, as defendants' total weekly

---

[3] The remaining $35.00 was retained by plaintiff to cover wire transfer fees. MTD at 4.

revenues were less than $63,461.50. Answer ¶ 97. Instead, the amount to be repaid was dictated by GMC by dividing the total sum to be repaid by the desired time of repayment, and the purchase of receivables was a sham designed to disguise that defendants' obligations constituted repayment of a loan. *Id*. ¶¶ 97–98.

Finally, the Agreement contained various provisions addressing defendants' obligations in the event of their failure to deliver the weekly repayment. First, the Agreement granted GMC a "first priority" security interest in all of the Corporate Defendants' existing and future property. Agreement at 3. Second, in the event of defendants' default, the uncollected amount due would become "payable in full immediately, without notice." *Id*. at 6. Third, Mr. Green signed the Agreement as the "Owner/Guarantor" of the Corporate Defendants, and also executed a "Guaranty of Performance" that authorized GMC to enforce the Agreement directly against Mr. Green without notice. *Id.* at 8.

After the execution of the Agreement, defendants made eight payments of $6,346.15 each. Answer ¶ 62. However, around November 2023, defendants' revenues declined significantly, and defendants informed GMC that the weekly payments were unsustainable. *Id*. ¶¶ 63–64. On or around November 8, 2023, defendants requested a repayment plan, but GMC refused that request or to alter the weekly repayment amount. *Id.* ¶¶ 63, 137. The following week, defendants failed to make the weekly payment due on November 15, 2023. Complaint ¶ 9. After defendants continued to miss the weekly payment in the subsequent three weeks, GMC held defendants in default, with an outstanding balance of $284,925.80 to be paid under the Agreement. *Id.*

### III.    The Prior Agreement

In March 2023, six months prior to execution of the Agreement, the parties had previously executed a similar agreement (the "Prior Agreement."). Answer ¶ 59. Under the Prior Agreement's terms, GMC agreed to immediately pay defendants $101,000.00 in exchange for 10% of defendants' receivables, to be repaid by defendants in 48 weekly installments of $2,840.62 each (totaling $136,350.00). *Id.*

As alleged by defendants, GMC refused to reconcile defendants' payment obligations to conform to their actual receivables. *Id.* ¶ 131. Instead, GMC would lower the payments and then "unilaterally snap[] the amount back to the higher amount" initially required by the Prior Agreement. *Id.* ¶ 134. At some point, defendants became unable to pay that weekly amount, and GMC "forced [d]efendants . . . to enter into a 'refinance,' [*i.e.*, the Agreement,] which extended no new capital to [d]efendants, but rather just increased the . . . amount of debt owed to [GMC]." *Id.* ¶ 135.[4]

## IV.    Procedural History

GMC filed the instant action to enforce the Agreement in state court, and defendants removed the case to this court on February 2, 2024. Notice of Removal, ECF No. 2. Defendants filed an Amended Answer that asserted counterclaims for (1) declaratory judgment, (2) breach of contract, and (3) violation of civil RICO. Answer ¶¶ 105–185. GMC now moves to dismiss those counterclaims.

---

[4] Although the Answer does not precisely identify whether the above allegations refer to events that occurred under the Prior Agreement or the Agreement, I draw the inference that those allegations relate to the Prior Agreement. *See Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 521 (2d Cir. 2006) (noting that, in deciding a motion to dismiss, the court must "draw[ ] all inferences in the plaintiff's favor"). Defendants' allegation that GMC lowered and subsequently raised the weekly repayment due, Answer ¶ 131, is incompatible with their admission that they made eight equal payments under the Agreement, *id.* ¶ 62, and therefore must have occurred under the Prior Agreement.

## STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), a court "must construe [the complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021). To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions are not entitled to the presumption of truth, and therefore "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024) (internal quotation marks and citation omitted).

In adjudicating a motion to dismiss under Rule 12(b)(6), I may consider "documents attached to [the complaint] or incorporated in it by reference," as well as "documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference." *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 296 (E.D.N.Y. 2017). I therefore may consider the Agreement, a copy of which was attached as an exhibit to GMC's complaint and its motion to dismiss. Defendants do not dispute that they had notice of the Agreement, that it is integral to their claims for breach of that Agreement, and that the document offered by GMC is a true and accurate copy of the Agreement. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (noting that district court "could have viewed" stock purchase agreement for purposes of motion to dismiss "because there was undisputed notice to plaintiffs of [the agreement's] contents and [it] w[as] integral to plaintiffs' claim").

## DISCUSSION

### I.    Declaratory Judgment

In defendants' first cause of action, they assert a counterclaim for declaratory relief establishing that the Agreement is a disguised loan with an effective interest rate that is usurious under New York law. *See* Answer ¶¶ 105–27.

The New York usury statute prohibits a lender from charging a corporate debtor interest on a loan "at a rate exceeding twenty-five per centum per annum." N.Y. Penal L. § 190.40; *see also* N.Y. Gen. Oblig. L. § 5–521. Should the lender seek to enforce a loan agreement that imposes an interest rate greater than twenty-five percent, a corporate debtor may raise an "affirmative defense of usury and, if successful, obtain a declaration that invalidates the debt instrument." *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 254 (S.D.N.Y. 2022). The lender of a usurious loan forfeits all outstanding payments, including "both principal and interest." *Adar Bays, LLC v. GeneSYS ID, Inc*., 37 N.Y.3d 320, 326 (2021).

However, "New York courts have uniformly construed [the corporate usury] statute as limited to [an] affirmative defense, and they have prohibited corporations from bringing affirmative claims or counterclaims alleging criminal usury and seeking to invalidate an agreement." *Haymount*, 609 F. Supp. 3d at 254 (collecting cases); *see also Paycation Travel, Inc. v. Glob. Merch. Cash, Inc.*, 141 N.Y.S.3d 319, 320 (2d Dep't 2021) ("General Obligations Law § 5–521 bars a corporation . . . from asserting usury in any action, except in the case of criminal usury as defined in Penal Law § 190.40, and then only as a defense to an action to recover repayment of a loan, and not as a basis for a cause of action . . . for affirmative relief.").

Accordingly, I grant GMC's motion to dismiss the counterclaim for declaratory judgment. However, I note that dismissal of the affirmative counterclaim makes little practical

difference in this case. GMC filed the present action to enforce the Agreement, and defendants have also asserted usury as an affirmative defense. Answer ¶ 35. Should defendants successfully prove that the Agreement is a usurious loan under that defense, they will in any event obtain the precise relief that they seek under their declaratory judgment counterclaim—a declaration that the Agreement is invalid. *See Haymount*, 609 F. Supp. 3d at 254 (noting that a debtor who prevails on the affirmative defense of usury is entitled to a declaration that "invalidates the debt instrument").

## II.    Breach of Contract

Defendants' second counterclaim asserts that GMC breached the reconciliation provisions of the Agreement and the Prior Agreement.[5] *See* Answer ¶¶ 128–42. To state a breach of contract claim under New York law, the "complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the [claimant], (3) breach of contract by the [counterparty], and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks omitted). GMC argues that defendants have failed to allege the latter three elements.

As a preliminary matter, I note that defendants appear to plead a breach of both the Agreement (on which GMC's own claims are premised) and the Prior Agreement (which

---

[5] The Answer also asserts that plaintiff breached the agreements by failing to perform due diligence to earn the $7,500.00 origination fees, which the agreements purported were for plaintiff's "due diligence and other costs." Answer ¶ 140. Plaintiff has also moved to dismiss that theory of breach, *see* MTD at 12, and defendants raise no argument in response. I therefore deem that theory of contractual breach abandoned. *See Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) (noting that a court may "deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismiss[al]"); *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court . . . generally will[] deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").

defendants allege was the precursor to the agreement). *See* Answer ¶ 135 (alleging that the Agreement was a "refinance" of the Prior Agreement and that the Agreement "extended no new capital . . . but rather just increased the loan"). GMC's briefing does not address this distinction, and its arguments in support of dismissal are directed only at a breach of the Agreement. Nonetheless, defendants have failed to state a claim premised on either contract, and I therefore grant GMC's motion to dismiss the contract claim.

### A.    The Prior Agreement

Although inartfully pled, the Answer sufficiently alleges that the Prior Agreement existed and that GMC breached it. However, defendants' claim for breach of the Prior Agreement fails to allege defendants' own performance of the contract, and therefore must be dismissed.

Defendants allege that GMC adjusted the weekly payments downward based on defendants' actual receivables "at multiple times, . . . but then would unilaterally snap [the weekly payment] back" to the original amount. Answer ¶ 131. Defendants further allege that, before GMC could alter the weekly payment amount, the Prior Agreement required GMC to request certain documents from defendants and to then set the weekly payment amount based on defendants' actual receipts. *Id.* ¶ 132.[6] Finally, when defendants found themselves unable to pay the higher payments following the "snap back," GMC coerced them into "refinanc[ing]" the Prior Agreement by entering into the Agreement, which increased the amount owed by defendants. *Id*. ¶ 135. In short, defendants allege that GMC was not permitted under the Prior

---

[6] That allegation is borne out by GMC's complaint, as the Agreement contains a provision requiring GMC to obtain certain information before adjusting the weekly payment amount. Agreement at 5. Given that the Agreement appears to have been a "fill-in-the-blank" form contract, it is reasonable to infer that the Prior Agreement had substantially similar terms.

Agreement to raise defendants' weekly payment obligation without satisfying certain conditions, but that GMC did so anyway.

GMC's arguments that it did not breach the Agreement are inapplicable to defendants' claim that GMC breached the Prior Agreement, as GMC misunderstands the latter claim. GMC asserts that the Agreement did not require it to grant a payment adjustment until defendants first submitted certain documents, that defendants have not alleged that they provided those documents, and therefore GMC "had no obligation to provide" a payment reconciliation. MTD at 14–15. However, as to the Prior Agreement, defendants do not claim that GMC failed to grant them a payment reconciliation. Instead, defendants claim that GMC granted one or more changes to the weekly payment, but after doing so, unilaterally reset the payment obligation to the original amount. *See* Answer ¶¶ 131–35. Defendants' failure to plead that they satisfied the conditions to request a repayment reconciliation is therefore irrelevant, as defendants have sufficiently alleged that GMC failed to honor the repayment schedule after having *already granted* a reconciliation.

Nonetheless, defendants' claim for breach of the Prior Agreement fails, as the Answer does not allege that defendants adequately performed under the Prior Agreement. Defendants' inability to make the higher payments unilaterally imposed by GMC would not demonstrate that defendants failed to perform their obligations, as GMC's imposition of those payments violated the Prior Agreement. However, defendants do not allege what payments they made under the terms of the Prior Agreement, or indeed, that they made *any* payments at all. Accordingly, defendants have failed to allege their own "adequate performance of the contract." *Eternity Glob. Master Fund Ltd.*, 375 F.3d at 177. I therefore dismiss the counterclaim insofar as it is premised on a breach of the Prior Agreement. *R.H. Damon & Co. v. Softkey Software Prods., Inc.*, 811 F.

Supp. 986, 991 (S.D.N.Y. 1993) ("[W]hen pleading a claim for the breach of an express contract, . . . the complaint must contain some allegation that the plaintiffs actually performed their obligations under the contract.").

**B.    The Agreement**

Defendants' counterclaim for breach of the Agreement must also be dismissed. Defendants allege that "[a]t or around the time of the November 8, 2023 payment," Answer ¶ 63, they "informed [GMC] that they could not afford the payments and requested a payment plan," which GMC improperly refused, *id*. ¶ 137. However, Defendants' allegations are insufficient to demonstrate that GMC's refusal to adjust the repayment schedule constituted a breach of the Agreement.

The Agreement provided that, to request a reconciliation, defendants were required to send that request "in writing" and to submit certain documentation in support, and that GMC was "not . . . required to adjust the [repayment schedule] until . . . it . . . received" those items. Agreement at 5. Defendants' vague allegation that they "informed" GMC of their inability to make the weekly payment, Answer ¶ 63, does not demonstrate that they complied with those requirements. GMC's refusal to reconcile the payment amount was therefore permitted by the terms of the Agreement, and without further allegations cannot have constituted a breach of the Agreement's terms. *See Fleisig v. ED&F Man Cap. Mkts., Inc*., No. 19-CV-8217, 2021 WL 2678675, at *10 (S.D.N.Y. June 30, 2021) ("Because [the defendant] did not take any action that was not expressly permitted by its contracts with the plaintiffs, the plaintiffs' claims for breach of contract are unavailing.").

However, I note that submission of a "proper" reconciliation request in compliance with the Agreement is not an absolute precondition to a claim for breach of the Agreement. New York

law permits a party to assert a breach of contract due to the counterparty's anticipatory repudiation of the contract, which "occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002); *see also Fonda v. First Pioneer Farm Credit, ACA*, 927 N.Y.S.2d 417, 419 (3d Dep't 2011) (noting that anticipatory repudiation "excuses the non-repudiating party from further performance and entitles it to claim damages for total breach"). Thus, defendants may assert a contract claim based on GMC's response to their informal request for reconciliation, even if they have not alleged (or ultimately cannot allege) that their reconciliation request complied with the Agreement's requirements for such a request. For example, if GMC had declared that it would not grant reconciliation even if defendants submitted the necessary supporting documents, then defendants would have been entitled to treat that response as an anticipatory repudiation. *See Vision Ent. Worldwide, LLC v. Mary Jane Prods., Inc.*, No. 13-CV-4215, 2014 WL 5369776, at *3 (S.D.N.Y. Oct. 17, 2014) (holding that defendant's "e-mail that stated, 'This [concert] date is cancelled, nothing to discuss,' . . . was an anticipatory repudiation," as the defendant "was clearly declaring [its] intention not to perform its future obligations under the [a]greement"). Conversely, if GMC had refused to consider reconciliation until defendants submitted supporting documents supporting their entitlement to reconciliation, then no anticipatory breach occurred. *See Princes Point LLC v. Muss Dev. LLC*, 30 N.Y.3d 127, 133 ("For an anticipatory repudiation to be deemed to have occurred, the expression of intent not to perform by the repudiator must be positive and unequivocal." (internal quotation marks omitted)).

Nonetheless, defendants' allegations, as they currently stand, are insufficient to demonstrate that GMC's refusal to reconcile the weekly payment amounted to anticipatory

repudiation of the Agreement's reconciliation provision. Defendants merely allege that GMC "refused and failed to" provide a reconciliation and "made no effort or offer to adjust the weekly payment to reflect a percentage [of] the actual receivables." Answer ¶¶ 66, 70. That is simply insufficient. Without further allegations regarding the content of GMC's refusal, I cannot reasonably infer that GMC clearly "declare[d its] intention not to fulfill" its duty to reconcile the payment amount upon submission of a proper request. *Lucente*, 310 F.3d at 258.

For the reasons set forth above, I find that the defendants have failed to allege that GMC breached the Agreement's reconciliation provision. Accordingly, I grant GMC's motion to dismiss the counterclaim for breach of contract.

## III.    Civil RICO

Third, and finally, defendants assert a counterclaim under the civil RICO statute, 18 U.S.C. § 1964(c), claiming that GMC is part of a RICO enterprise operated by its owner and principal, Jay Keller, and his associates. *See* Answer ¶¶ 143–85.

As relevant here, the RICO statutes make it "unlawful for any person . . . associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To establish a RICO violation premised on a pattern of racketeering activity, "a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (internal quotation marks omitted). Alternatively, a plaintiff may also state a RICO violation by establishing a "single instance of collection of unlawful debt." *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020).

13

GMC asserts that defendants have failed to allege (1) that a RICO enterprise existed, (2) that the enterprise engaged in either the collection of an unlawful debt or a pattern of racketeering activity, and (3) that defendants have suffered a RICO injury.

### A.    RICO Enterprise

To establish a RICO violation, a plaintiff must "allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *see also* 18 U.S.C. § 1961(4) (defining "enterprise" as "includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity"). A corporation "can be sued as a RICO 'person' or named as a RICO 'enterprise,' . . . but the same entity cannot be *both* the RICO person and the enterprise." *U1it4less, Inc. v. Fedex* Corp., 871 F.3d 199, 205 (2d Cir. 2017) (citations omitted). Thus, "a plaintiff may not circumvent the distinctness requirement by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant." *Id*. at 206 (internal quotation marks and citation omitted).

Defendants allege that the "culpable person" is Jay Keller, the owner of GMC. Answer ¶¶157–58. Meanwhile, the alleged enterprise consists of Mr. Keller, GMC, GMC's investors, and brokers who solicited borrowers for and investors in GMC's loans. *Id*. ¶ 159, 172.  Defendants then allege that Mr. Keller "operated [GMC] as part of an unlawful enterprise," and pursuant to GMC's membership in the enterprise, GMC extended and collected upon unlawful loans. *Id*. ¶ 172.

14

Insofar as defendants seek to impose liability against GMC itself, the Answer fails to allege a distinct enterprise. As a preliminary matter, defendants' allegations regarding the "investors" are wholly conclusory. The answer asserts that, "[u]pon information and belief," the investors "maintain separate officers, . . . records, and bank accounts" from GMC and one another, and that they provided GMC with "the pooled funds necessary to fund [GMC's] usurious loans." Answer ¶¶ 173–74. However, defendants "have not advanced any factual allegations" that the investors formed "an ongoing organization, formal or informal," with GMC, nor are there any allegations that the investors and GMC "functioned as a continuing unit." *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004) (internal quotation marks omitted). The bare allegation that a series of investors, from time to time, advanced capital to GMC for its financial products does not demonstrate that those investors "formed a coherent entity [with GMC] that was separate and apart from the [racketeering activity]." *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 439 (S.D.N.Y. 2019). That is especially true given that defendants have failed to name, or even describe, who those investors are. *Berry v. Deutsche Bank Tr. Co. Americas*, No. 07-CV-7634, 2008 WL 4694968, at *7 (S.D.N.Y. Oct. 21, 2008) (concluding that allegations that various entities "loaned money in an arms length commercial transaction" to defendant were insufficient to establish that the lenders and defendant formed a RICO enterprise). Accordingly, I conclude that defendants have failed to allege that the investors were members of the purported enterprise.[7] *See Democratic Nat'l*

---

[7] I note that allegations establishing that GMC formed an enterprise with outside investors—entities which do not share a "corporate structure" or a "single corporate consciousness" with GMC—would likely satisfy the distinctiveness requirement. *U1it4less*, 871 F.3d at 206, 207; *see Lateral Recovery, LLC v. Funderz.net, LLC*, No. 22-CV-2170, 2024 WL 4350369, at *24 (S.D.N.Y. Sept. 27, 2024) ("At the pleading stage, Plaintiffs adequately alleged that [the MCA corporation], the [brothers who owned that corporation], and the John and Jane Doe investors [in the corporation's loans] formed an organized enterprise."). Such outside investors are sufficiently

*Comm.*, 392 F. Supp. 3d at 440 ("A plaintiff may not simply string[ ] together . . . various defendants and label[ ] them an enterprise." (internal quotation marks omitted)).

Absent the investors, the "enterprise" alleged by defendants is "nothing more than [GMC]," as it "consists merely of a corporate defendant and its corresponding . . . owners, employees, and [agents]." *Anglin Auto. LLC v. EBF Holdings, LLC*, No. 23-CV-1404, 2024 WL 1118892, at *8 (S.D.N.Y. Mar. 14, 2024). Moreover, those entities "are merely alleged to be carrying on the regular affairs" of GMC, *id.* (internal quotation marks omitted), as defendants allege that GMC's business is dedicated to collecting unlawful debts. Defendants therefore fail to allege that the purported enterprise members "were associated in any manner apart from the activities of [GMC]." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) (internal quotation marks omitted). As a result, all defendants have alleged is that GMC participated in an enterprise "comprised only of its agents [and itself]." *U1it4less*, 871 F.3d at 205 (internal quotation marks omitted). That is insufficient to assert a RICO claim, and I therefore dismiss defendants' RICO counterclaim against GMC.

However, the above analysis applies only to defendants' assertion of a claim *against GMC*, as opposed to any claim that defendants may have against Mr. Keller as an individual. Where a claimant "seeks to hold the *corporation itself* liable as a RICO 'person,' the RICO 'enterprise' may not then 'consist solely of the corporation plus its owners and/or employees.'" *Anglin Auto.*, 2024 WL 1118892, at *7 (emphasis added and citation omitted). By contrast, a claimant sufficiently meets the distinctiveness requirement by alleging that "a corporate employee unlawfully conduct[ed] the affairs of the corporation of which he is the sole owner—

---

distinct from GMC such that they could form an enterprise with GMC, and such investors cannot be considered "employees or agents" of GMC. *See U1it4less*, 871 F.3d at 206 (noting that a corporate defendant cannot form a RICO enterprise "with its own employees or agents.").

whether he conduct[ed] those affairs within the scope, or beyond the scope, of corporate authority." *Cedric Kushner*, 533 U.S. at 166; *see also id.* at 163 ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status."). Defendants allege that Mr. Keller is the "owner of [GMC]" and operated it to unlawful ends. Answer ¶¶ 158, 167. That meets the requirements of distinctiveness as announced by the Supreme Court, *see Cedric Kushner*, 533 U.S. at 166, and therefore defendants remain free to assert a third-party complaint against Mr. Keller alleging that he is the culpable RICO person and that GMC is the unlawful RICO enterprise, *see Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 464–65 (S.D.N.Y. 2022) (noting that a plaintiff may not "seek to hold a [MCA] corporation liable as a RICO person by virtue of the acts of the corporation and those acting on its behalf," but may "seek[] to hold . . . individual defendants . . . liable for using the association-in-fact for their unlawful purposes" (collecting cases)).

At present, however, defendants have only asserted an "inten[t]" to file a third-party complaint against the appropriate individuals, Answer at 27 n.18, and have not taken any steps to assert a claim against Mr. Keller. Instead, the Answer asserts a counterclaim for relief against GMC, and that claim fails for the reasons explained above.

B.    **Injury**

A RICO plaintiff "only has [statutory] standing if, and can only recover to the extent that, he has been injured in his business or property by the [RICO] conduct." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Thus, a plaintiff "without provable damages" may not maintain a RICO cause of action. *Com. Union Assur. Co. v. Milken*, 17 F.3d 608, 612 (2d Cir. 1994). I agree with GMC that defendants have failed to allege an injury. Thus, even if defendants had

established that GMC was part of a distinct RICO enterprise, I would still dismiss defendants' RICO claim.

The Answer alleges two claimed injuries. First, defendants assert that they were injured by GMC's collection of usurious loan payments. Answer ¶ 182. However, even assuming that the contracts were disguised loans, defendants have not sufficiently alleged that they were injured by GMC's collection of payments. Under the Prior Agreement, defendants received $101,000 from GMC and promised to repay $136,350. *Id.* ¶ 59. Subsequently, the Agreement purported that defendants would receive $250,000 from GMC and would repay $330,000, *id.* ¶ 57, but in fact the Agreement operated as a "refinance" of the Prior Agreement and "extended no new capital" to defendants, *id.* ¶ 135. The import of those allegations is that defendants only received $101,000.00 from GMC. As for their repayments, defendants allege that they made eight payments of $6,346.15 each (for a total of $50,769.20) under the Agreement, *id.* ¶ 62, but do not describe what payments, if any, they made under the Prior Agreement.

Damages under RICO for injury to business or property must "place [claimant] in the same position they would have been in but for the illegal conduct." *Com. Union Assur. Co.*, 17 F.3d at 612; *see also Sedima*, 473 U.S. at 496 (noting that a RICO plaintiff "can only recover to the extent that[] he has been injured"). Where the claimants "have already been placed . . . in that position [or better]," the claimants lack damages and thus have no viable RICO claim. *Com. Union Assur. Co.*, 17 F.3d at 612 (holding that investor had no RICO claim for fraud where investment yielded a net gain). Here, defendants have alleged a financial benefit from GMC's assertedly illegal loans—the advance of principal—that defendants obviously would not have received absent those loans. A proper calculation of defendants' injury from the loan agreements "requires a reduction of the financial benefit that [they] received at the time of the transaction."

18

*Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-CV-5120, 2022 WL 3536128, at *4 (S.D.N.Y. Aug. 17, 2022) (holding that damages for RICO claim predicated on collection of unlawful debt must be reduced by amount advanced as principal), *aff'd sub nom. Fleetwood Servs., LLC v. Richmond Cap. Grp., LLC*, No. 22-1885-CV, 2023 WL 3882697 (2d Cir. June 8, 2023).

Thus, to state a claim, defendants must allege that they paid GMC more than they received from GMC. Defendants' allegations that they repaid $50,769.20 to GMC are therefore insufficient to establish an injury resulting from the agreements, as defendants' allegations establish that they received $101,000.00 and thus obtained a net gain from the purportedly usurious loan agreements. Answer ¶¶ 59, 62. Permitting defendants to assert a RICO injury for unlawful debt when defendants have not fully returned the principal would fail to account for the "financial benefit from th[ose] Agreement[s] through the funds [GMC] advanced" and permit damages for funds "of which [defendants] w[ere] never actually deprived . . . resulting in a windfall to [defendants]." *Fleetwood Servs., LLC*, 2022 WL 3536128, at *4. And while defendants presumably made some payments under the Prior Agreement, defendants' allegations lack any detail about how many payments were made or how much was paid, and therefore do not permit the reasonable inference that defendants' total repayments exceeded $101,000. Accordingly, I find that defendants have failed to allege they were injured by GMC's collection of "usurious loan payments." Answer ¶ 182.

Defendants also allege that they "have . . . suffered and will suffer damages by incurring attorneys' fees and costs." Answer ¶ 183. Legal fees that are "proximately caused by a RICO violation," such as fees incurred to defend against collection of a usurious loan, are cognizable as a RICO injury. *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993)

19

(finding legal fees spent in response to defendants' illegal actions to be RICO injuries because "legal fees may constitute RICO damages when they are proximately caused by a RICO violation"); *see also Angermeir v. Cohen*, 14 F. Supp. 3d 134, 153 (S.D.N.Y. 2014). However, defendants fail to allege that they have actually incurred any past legal fees, as the answer fails to allege that GMC has instituted any legal action to collect on the debt other than its complaint *in this very case*. Thus, defendants' claimed injury is limited to future legal fees that they will incur in defending against the present collection action. But those fees fail to state an injury because they are not yet "clear and definite." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) ("[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite."). It is not clear at present that defendants will prevail in demonstrating that the Prior Agreement and Agreement were usurious loans, nor is it possible to determine how much money defendants will ultimately spend to do so should they prevail. Defendants' claim for attorneys' fees has therefore yet to be realized and does not state an independent RICO injury. *See Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988) (holding that plaintiff's "ongoing legal fees" were "future expenses" for which plaintiff "ha[d] not yet suffered injury" and that plaintiff's "claim therefor [wa]s yet to accrue"); *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc*., 17 F. Supp. 3d 207, 234 n.11 (E.D.N.Y. 2014) (holding RICO claims not ripe "to the extent plaintiff seeks to recover attorneys' fees and costs incurred by litigating [ongoing] claims in state court and arbitration," as the "amount of these RICO damages [is] not yet clear and definite").[8]

---

[8] I note, however, that defendants' fees defending against GMC's collection action are not absolutely unrecoverable. "The trial court may, of course, permit supplementation of the complaint to allow for damages [in the form of ongoing legal fees]," *Bankers Tr. Co*., 859 F.2d at 1106, as at that point they will have become past legal fees.

### C.    Conspiracy

"In the absence of any viable underlying 18 U.S.C. § 1962(c) claim, plaintiff's RICO conspiracy claims . . . pursuant to 18 U.S.C. § 1962(d) must also fail." *Moss*, 258 F. Supp. 3d at 309; *see also First Cap. Asset Mgmt., Inc.*, 385 F.3d at 182 ("[B]ecause Plaintiffs did not adequately allege a substantive violation of RICO . . . , the District Court properly dismissed Count Six, which alleged a RICO conspiracy in violation of 18 U.S.C. § 1962(d).").

### D.    Conclusion

In conclusion, defendants have failed to sufficiently allege a RICO injury under either theory of injury asserted in their Answer.[9] Defendants have also failed to allege that GMC was part of an enterprise distinct from itself. I therefore grant GMC's motion to dismiss defendants' RICO claims.[10]

## IV.    Conclusion and Remedy

---

[9] In their briefing, defendants argue that they suffered "harm to business reputation." Def.'s Opp. at 19. The Answer contains no reference to such reputational harms, and I therefore need not consider that argument. *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013) (A plaintiff "cannot amend [its] complaint by asserting new facts . . . for the first time in opposition to [a] . . . motion to dismiss."). Even if I were to consider that argument, defendants' wholly conclusory assertion of reputational harm would fail. *See Kimm v. Chang Hoon Lee & Champ, Inc.*, 196 F. App'x 14, 16 (2d Cir. 2006) (no RICO injury where "the generalized reputational harms alleged, including the risk of future lost business commissions, are too speculative to constitute an injury to business or property"); *Petroff Amshen LLP v. Alfa Rehab PT PC*, No. 19-CV-1861, 2021 WL 960394, at *12 (E.D.N.Y. Mar. 15, 2021) (allegations failed to plausibly allege RICO injury where they "fail[ed] to identify specific instances of lost business and only conclusorily allege[d] potential lost clients based on reputational harm").

[10] I therefore need not, and do not, address GMC's additional arguments that defendants have failed to allege that the Agreement and Prior Agreement were unlawful debts or that the purported enterprise engaged in a pattern of racketeering activity. *See, e.g.*, *Moss*, 258 F. Supp. 3d at 296 n.3 (granting motion to dismiss RICO claim for failure to allege enterprise, but declining to address defendants' additional arguments for dismissal based on failure to plead that agreements were unlawful).

For the reasons set forth above, I GRANT GMC's motion to dismiss defendants' (1) declaratory judgment, (2) breach of contract, and (3) civil RICO counterclaims. However, defendants are granted leave to amend their answer to reassert the latter two claims.

Leave to amend a pleading shall be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), and should be granted unless: (1) the movant acts in bad faith, (2) the amendment sought will be futile, (3) the motion is filed after undue delay, or (4) granting leave to amend would prejudice the adverse party. *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Davidson v. Cnty. of Nassau*, No. 18-CV-1182, 2020 WL 956887, at *4 (E.D.N.Y. Feb. 26, 2020) (internal quotation marks omitted). None of the above grounds apply to defendants' claims for breach of contract or civil RICO, and granting leave to amend is therefore appropriate. By contrast, amendment of the declaratory judgment claim would be futile, as such a claim does not exist under New York law. The claim for declaratory judgment is therefore dismissed with prejudice. *See Milanese*, 244 F.3d at 110 (noting that dismissal with prejudice is proper where amendment would be futile).

Any amended counterclaims must be filed within thirty (30) calendar days of this Opinion and Order.